**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **ANDREW KUHLMANN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. 4:21-CV-412 PLC** |
| | ) |
| **KILOLO KIJAKAZI,** | ) |
| **Acting Commissioner of Social Security,**[1] | ) |
| | ) |
| **Defendant,** | ) |

**MEMORANDUM AND ORDER**

Plaintiff Andrew Kuhlmann seeks review of the decision of Defendant Acting Social Security Commissioner Kilolo Kijakazi, denying his application for Supplemental Security Income (SSI) under the Social Security Act.  Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

**I.      Background and Procedural History**

On August 16, 2019, Plaintiff filed an application for SSI, alleging he was disabled as of December 1, 2011[2], due to major depressive disorder, pacemaker, A-Fib, defibrillator, congestive heart failure, and plantar fasciitis.  (Tr. 332, 390-395)[3]  The Social Security Administration (SSA)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] On October 10, 2019, Plaintiff amended his onset date to March 20, 2019.  (Tr. 396-397)  On May 28, 2020, he amended his alleged onset date again, to April 11, 2019.  (Tr. 282, 407)

[3] The ALJ states Plaintiff previously filed a Title XVI application on October 20, 2017, which was denied by the State agency on January 30, 2018.  (Tr. 11)  Finding a lack of good cause in the record, she declined Plaintiff's attorney's request to reopen the prior application back to the amended alleged onset date of April 2019.  (*Id.*)  The ALJ explained her ruling as follows:

initially denied Plaintiff's claim in September 2019, and he filed a timely request for a hearing before an administrative law judge (ALJ).  (Tr. 332, 338)  The SSA granted Plaintiff's request for review and conducted a hearing in July 2020.  (Tr. 271-316)

In a decision dated August 31, 2020, the ALJ determined that Plaintiff "has not been under a disability within the meaning of the Social Security Act since July 16, 2019, the date the application was filed."  (Tr. 12)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-7)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ

Plaintiff, born January 30, 1975, testified that he lived in a group home as a result of both homelessness and his heart condition.  (Tr. 277, 390)[4]  Plaintiff explained that he was assigned weekly tasks in the home, which included cleaning the showers and bathrooms, hauling trash, sweeping, cleaning the dining room after meals, and dusting.  (Tr. 279)  He elaborated that the chores generally consumed 10 to 15 minutes twice a day, and that after completing them he usually needed to take a break.  (Tr. 287-288)

---

The claimant is asking the undersigned to adjudicate a period that was not previously adjudicated.  Moreover, as explained in greater detail below, the new evidence submitted in this case shows the claimant's impairments were largely controlled with medication by 2019 or even earlier.  Whether the analysis begins in April 2019 or July 2019, the outcome is the same.  Thus, while there is new evidence in this case, the evidence is not material.

(*Id.*)

[4] Plaintiff stated he was awarded Medicaid benefits in December 2019, and currently was waiting for an apartment opening.  (Tr. 277-278)

2

Plaintiff testified he was disabled due to A-Fib, sleep apnea, hypertension, and cardiomyopathy.[5]  (Tr. 283)  He explained that because of his heart condition and medications he needed to use the bathroom frequently throughout the day[6], and had to keep his legs elevated at heart level most of the day.  (Tr. 283, 296-297)  He further testified that his medications, A-Fib and cardiomyopathy tended to cause dizziness.  (Tr. 288, 291)[7]

A vocational expert also testified at the hearing.  (Tr. 297-315)  The ALJ asked the vocational expert to consider a hypothetical individual the same age, education, and work experience as Plaintiff, with the following limitations:

> Further assume that that person is limited to medium exertional work….Stand and/or walk six hours in an eight-hour workday.  Sit up to six hours in an eight-hour workday.  Avoid concentrated exposure to hazards such as moving, mechanical parts, and heights,…Avoid all exposure to hazards such as unprotected heights, and unprotected moving mechanical parts….[A]nd then limited to routine, repetitive tasks…in a low stress job, meaning occasional changes in the work setting and occasional ability to make [INAUDIBLE][8] work related decisions.

(Tr. 302)  The vocational expert stated that such an individual would not be able to return to any of Plaintiff's past work, but that there were other unskilled jobs in the national economy that he could perform, such as warehouse worker, packer, and assembler.  (Tr. 302-303)  When the ALJ changed the exertional level to light, the vocational expert opined the hypothetical individual could

---

[5] When the ALJ asked why he believed he was disabled, Plaintiff did not mention mental health concerns in his response.  (Tr. 282-283)

[6] Plaintiff agreed with his treating cardiologist, Justin M. Vader, M.D.'s assessment that he would need to make four or five trips to the bathroom, lasting five to ten minutes each, during an eight-hour workday.  (Tr. 293)  He further stated that mornings were especially difficult, as that is when he took his diuretic.  (*Id.*)

[7] Plaintiff stated the dizziness had been "part of [his] normal…for the last five years."  (Tr. 291)

[8] The hearing before the ALJ was held telephonically due to the COVID-19 pandemic, and at times the transcript describes the testimony as inaudible.

3

still work as an assembler[9], packer or product inspector.  (Tr. 303)  The ALJ then moved to an exertional level of sedentary, with the same stated limitations as the earlier hypothetical, and the vocational expert testified that possible jobs included product inspector, assembler, or production worker.  (Tr. 304)  The vocational expert testified extensively regarding allowable bathroom breaks in the various positions, ultimately concluding that the jobs differ but generally would allow occasional breaks at most, and possibly would require permission from a supervisor.  (Tr. 304-308)[10]  He further opined that none of the jobs mentioned, including those at the sedentary level, could accommodate someone who needed to keep his lower extremities elevated for long periods of time.  (Tr. 308)  Finally, the vocational expert stated the jobs he considered would allow a maximum of one absence per month, and that available positions would decrease by up to fifteen percent if the worker were limited to avoid concentrated exposure to pulmonary irritants, extreme cold or heat, high humidity or wetness.  (Tr. 309-311)

With regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his Statement of Material Facts, which the Commissioner admitted in their entirety.  (ECF Nos. 26-1, 31-1)  The Court also adopts the facts set forth in the Commissioner's Statement of Additional Facts, because Plaintiff did not refute them.  (ECF No. 31-2)  The Court will cite to specific portions of the transcript as needed to address the parties' arguments.

**III.     Standards for Determining Disability Under the Social Security Act**

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health*

---

[9] For both assembler and packer, the vocational expert noted the jobs were in similar classifications as those available under medium work, but had different DOT classification numbers.  (Tr. 303)
[10] The vocational expert stated that a person who needed to take unscheduled breaks four or five times a day, for five or ten minutes each, in addition to regular breaks "would not be sustainable" and would be replaced.  (Tr. 309)

*& Hum. Servs.*, 955 F.2d 552, 555 (8ᵗʰ Cir. 1992).  Under the Social Security Act, a person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8ᵗʰ Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8ᵗʰ Cir. 2011) (discussing the five-step process).  At step one, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At step two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the [twelve-month] duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(ii); *McCoy*, 648 F.3d at 611.  To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  At step three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611.  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to step four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. § 416.920(a)(4), which is "the most [a claimant] can still do despite [his or her] limitations," 20 C.F.R. § 416.945(a)(1).  *See also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).  At step four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  At step five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.960(c)(2).

**IV.    The ALJ's Decision**

6

The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920 and found that Plaintiff:  (1) had not engaged in substantial gainful activity since July 16, 2019, the application date; and (2) had the severe impairments of congestive heart failure, cardiomyopathy, atrial fibrillation status post ICD[11] placement, obesity, and affective disorder, that significantly limited his ability to perform basic work activities as required by SSR 85-28.  (Tr. 13-14)[12]  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15)

The ALJ found that, although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 18)  For example, the ALJ found that while Plaintiff has cardiovascular impairments that reasonably would result in some limitations, the treatment history showed those problems had significantly improved by 2019.  (Id.)  With respect to bathroom frequency, the ALJ found Plaintiff's subjective complaint was not supported in the record, as treatment notes demonstrated Plaintiff either denied or failed to mention he experienced urinary frequency.  (Tr. 19)  Further, while Plaintiff claimed a need to elevate his legs throughout the day to avoid swelling, the ALJ found his medical providers generally noted no edema in the lower extremities[13], and there was nothing in the treatment notes indicating that Dr.

---

[11] "ICD" refers to implantable cardioverter defibrillator.

[12] The ALJ found Plaintiff's hypertension, plantar fasciitis, sleep apnea, vitamin D deficiency and monocytosis were nonsevere impairments, as they did not cause more than minimal effects on his ability to engage in basic work duties.  (Tr. 14)

[13] The ALJ acknowledged that Dr. Vader observed "trace bilateral lower extremity edema" in January 2020,  but found he was "apparently unconcerned about this issue, given that he cut the claimant's spironolactone dosage and made no other adjustments to treatment[.]"  (Tr. 19)

Vader advised Plaintiff to elevate his legs or reduce his activity due to his heart condition. (*Id.*) The ALJ noted that despite Plaintiff's claim of severe fatigue, his medical providers generally found him to be alert, awake and oriented, and Plaintiff himself reported some improvement in his energy level since he restarted continuous positive airway pressure ("CPAP") treatment. (*Id.*) Finally, with regard to dizziness, the ALJ pointed to Plaintiff's testimony that he had experienced the same degree on a constant basis for five years, which would include a period before the alleged disability onset date when Plaintiff was employed full-time. (Tr. 20) The ALJ concluded that with respect to Plaintiff's cardiovascular impairments, "the record as a whole, including the claimant's activities of daily living, relatively mild subjective complaints (except for fatigue, which Dr. Brown[14] does not attribute to his heart condition), the conservative treatment history, normal LVEF[15], and normal findings on physical examination, supports the conclusion the claimant is capable of performing work within the above residual functional capacity." (*Id.*).

With respect to Plaintiff's obesity, the ALJ recognized that it is a "medically determinable impairment" that often complicates both chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems, and contributes to mental impairments such as depression. (Tr. 20) The ALJ found, however, that Plaintiff's medical providers generally noted normal gait, cardiovascular signs, and pulmonary effort, and while they recommended improved diet and exercise they did not prescribe advanced treatment for the condition. (*Id.*)

Finally, with respect to alleged mental impairments, the ALJ acknowledged that Plaintiff reported symptoms such as depressed mood, anxiety, isolation, lack of motivation, and poor concentration. (Tr. 22) The ALJ found, however, that the treatment notes showed a general trend

---

[14] "Dr. Brown" refers to David J. Brown, M.D., Plaintiff's primary care physician.
[15] "LVEF" refers to left ventricular ejection fraction.

of improvement, there was no evidence of inpatient psychiatric treatment, and Plaintiff had not

been taking any medication for his psychological symptoms.  (*Id.*)  She further outlined the manner

in which other evidence showed Plaintiff's symptoms (including lack of concentration, and

inability to complete tasks or handle stress or changes in routine) were not as severe as alleged.

(*Id.*)

The ALJ then turned to the medical opinions in the record.  She summarized Dr. Vader's

assessment as follows:

> Dr. Vader suggested the claimant cannot walk more than a mile; has a marked
> limitation in physical activity, as demonstrated by fatigue, palpitation, dyspnea, or
> angina discomfort on ordinary physical activity; is only capable of low stress work
> due to frequent fatigue and dyspnea with exertion; has occasional difficulty with
> attention and concentration for even simple work tasks due to his cardiac
> symptoms; may have to take frequent bathroom breaks related to medications; may
> not be able to walk frequently due to consistent dyspnea and fatigue; can sit for less
> than two hours; can stand/walk for less than two hours; needs to shift positions at
> will from sitting, standing, or walking; needs 4-5 unscheduled 10-minute breaks
> during an eight-hour working day; needs to elevate his legs at heart level 25-50%
> of an eight-hour day; can lift and carry less than 10 pounds frequently and up to 10
> pounds occasionally; can occasionally twist, stoop, and crouch/squat; can rarely
> climb ladders or stairs; can endure moderate exposure to temperature extremes,
> high humidity, wetness, and pulmonary irritants; and would be absent from work
> about four days per month.

(Tr. 20-21)  She found that Dr. Vader's June 2020 medical source statement was not persuasive,

however, because it was not supported by the underlying treatment notes and was inconsistent with

the record as a whole.  (Tr. 21)  Specifically she noted that, among other things, Dr. Vader:  failed

to specify any objective clinical observations to support Plaintiff's subjective symptom statements;

acknowledged Plaintiff did not have other characteristic cardiovascular symptoms, such as chest

pain, edema[16], weakness, dizziness, or palpitation; rated Plaintiff's New York Heart Association

---

[16] The ALJ noted that Dr. Vader's finding of no edema contradicted his statement that Plaintiff
would need to elevate his legs 25-50% of an eight-hour day.  (Tr. 21)

("NYHA") functional classification (based on his subjective symptoms) as I, indicating no limitation on ordinary physical activity[17]; and stated Plaintiff's prognosis was "good," which tended to undermine the extreme limitations outlined in his opinion.  (*Id.*)[18]

The ALJ then considered the opinion of Renu Debroy, M.D., the Medical Consultant for the State agency.  The ALJ found Dr. Debroy's opinion that Plaintiff could engage in "medium exertional work with no concentrated exposure to hazards such as machinery and heights" was persuasive, because it was supported by a review of the evidence. (Tr. 22)  The ALJ further noted that Dr. Debroy's opinion was consistent with the full hearing-level record.  (*Id.*)  While Dr. Debroy recommended that Plaintiff avoid concentrated exposure to machinery and heights (Tr. 324), the ALJ went further, finding Plaintiff should avoid all exposure to hazards given his ongoing treatment for congestive heart failure and cardiomyopathy.  (Tr. 22)

Finally, the ALJ found the opinion of Stephen Scher, PhD, the Psychological Consultant for the State agency, somewhat persuasive. (Tr. 23)  She noted the opinion was both supported by a review of the evidence, including the treatment history and mental status evaluations, and consistent with the conservative treatment history (including no medications), and findings of sustained concentration and normal mood.  (*Id.*)  The ALJ agreed with Dr. Scher's suggestion that Plaintiff could understand, remember and carry out a two-step command involving simple instructions with adequate persistence and pace, but would struggle with detailed or complex instructions, and could perform simple repetitive tasks.  (*Id.*)  The ALJ further specified that

---

[17] Someone with NYHA Class I symptoms has "[n]o limitation of physical activity.  Ordinary physical activity does not cause undue fatigue, palpitation, [or] dyspnea (shortness of breath)." *See* Classes of Heart Failure:  American Heart Association, last visited February 8, 2023.
[18] Plaintiff does not dispute the ALJ's finding that Dr. Vader's June 2020 medical source statement was not persuasive.  In any event, for claims filed on or after March 27, 2017, the rule that a treating source opinion is entitled to controlling weight has been eliminated.  *See* 20 C.F.R. § 416.920c.

10

Plaintiff would need a low stress environment, however, given his ongoing treatment for depression. (*Id.*)

After "careful consideration of the entire record," the ALJ determined that Plaintiff had the RFC to perform medium work, except that:

> the claimant can stand/walk for six hours in eight-hour workday; can sit for six hours in eight-hour workday; must avoid all exposure to hazards such as unprotected heights and unprotected moving mechanical parts; and is limited to routine, repetitive tasks consistent with SVP 1 or 2 in a low stress job environment, with "low stress" defined as occasional changes in work setting and ability to make noncomplex work-related decisions.

(Tr. 17) Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform any past relevant work, but had the RFC to perform jobs that existed in significant numbers in the national economy, such as warehouse worker, packer, and assembler. (Tr. 23-24)[19]  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since July 16, 2019, the date the application was filed. (Tr. 25)

## V.   Discussion

Plaintiff claims the ALJ erred in determining his RFC because substantial evidence did not exist in the record to support the RFC determination. (ECF No. 26)  The Commissioner counters that substantial evidence supported the ALJ's RFC determination. (ECF No. 31)

### A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'"  *Chesser v. Berryhill*,

---

[19] The ALJ continued to list jobs available to Plaintiff if he were restricted to light work or sedentary work, and those available if he needed occasional, brief restroom breaks in addition to customary breaks. (Tr. 24-25)

858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome." *Id*. (internal quotation marks and citations omitted).

A court does not "'reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, the Court must affirm the ALJ's decision if "'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).

B.   RFC Determination

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  *See also Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (internal quotation marks and citation omitted).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (internal quotation marks and citation omitted).  "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citations omitted).  An ALJ "is not limited to considering medical evidence exclusively," as even though the "RFC

12

assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citations omitted). While the Court recognizes that an ALJ "may not draw upon [her] own inferences from medical reports," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), the Eighth Circuit has held that the "interpretation of physicians' findings is a factual matter left to the ALJ's authority." *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (citation omitted).

C. Consideration of Medical Opinion Evidence

Plaintiff filed his applications for benefits after March 2017. Accordingly, the ALJ's treatment of medical opinion evidence is governed by 20 C.F.R. § 416.920c. Under this regulation, ALJs are to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors – supportability, consistency, the medical source's relationship with the claimant, specialization, and other factors such as the source's understanding of the Social Security Administration's disability policies. 20 C.F.R. § 416.920c(c). ALJs must "articulate in [their] determination or decision how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b).

In evaluating the persuasiveness of a medical opinion, the factors of supportability and consistency are the most important for an ALJ to consider, and the ALJ must "explain how [she] considered the supportability and consistency factors . . . in [the] determination or decision." 20 C.F.R. § 416.920c(b)(2).[20] An ALJ's failure to address either the consistency or supportability

---

[20] "Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). "Consistency. The more consistent a medical opinion(s) . . . is with the evidence from other

factor in assessing the persuasiveness of a medical opinion requires reversal.  *Bonnett v. Kijakazi*, 859 Fed. Appx. 19 (8th Cir. 2021) (unpublished) (per curium) (citing *Lucas v. Saul*, 960 F.3d 1066, 1069-70 (8th Cir. 2020) (remanding where ALJ discredited physician's opinion without discussing factors contemplated in regulation, as failure to comply with opinion-evaluation regulation was legal error)).  See also *Starman v. Kijakazi*, No. 2:20-CV-00035- SRC, 2021 WL 4459729, at *5 (E.D. Mo. Sept. 29, 2021).   An ALJ need not explain in his or her decision how he or she considered the other factors.  20 C.F.R. § 416.920c(b)(2).

1.  Dr. Debroy

On September 23, 2019 Dr. Renu Debroy, a non-examining physician, reviewed certain evidence and completed a Physical Residual Functional Capacity Assessment.  (Tr. 317-330)  In her opinion, Dr. Debroy found that for the period March 20, 2019 to the present, Plaintiff had the following medically determinable impairments ("MDI"):  chronic heart failure, cardiomyopathy, recurrent arrhythmias, essential hypertension, and other disorders of the skin and subcutaneous tissues.  (Tr. 321, 323)  She stated that Plaintiff had exertional limitations as follows:  lift and/or carry 25 pounds frequently[21] and 50 pounds occasionally[22]; stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; and push and/or pull on an unlimited basis.  (Tr. 323)  Dr. Debroy opined that Plaintiff had no postural, manipulative, visual or communicative limitations, but should avoid concentrated exposure to hazards including machinery and heights.[23]  (Tr. 323-324)  Dr. Debroy did not limit Plaintiff's exposure to extreme cold, extreme heat, wetness, humidity, noise,

---

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. § 416.920c(c)(2).

[21] "Frequently" is defined as "cumulatively more than 1/3 up to 2/3 of an 8 hour day."  (Tr. 323)
[22] "Occasionally" is defined as "cumulatively 1/3 or less of an 8 hour day."  (Tr. 323)
[23] The final limitation was imposed due to Plaintiff's history of heart failure and A-fib.  (Tr. 324)

14

vibration, fumes, odors, dusts, gases, or poor ventilation. (Tr. 324) As relevant here, Dr. Debroy

provided additional explanation as follows:

> Claimant has MDI for cardiomyopathy and heart failure. Claimant does have a
> defibrillator. In April 2018 claimant had a follow up for A-fib post ablation from
> 2017 and ongoing care of dual chamber defibrillator. It was noted that claimant
> had no atrial fibrillation since 08/2017. Echo on this date showed EF at 66%.
> Claimant reported he continues to feel well with no major complaints. He stated
> he works out without significant complaints. He did report occasional fleeting chest
> pains but that it doesn't stop him from completing activities. Claimant was seen in
> June 2018 for follow up. He had been completely off Amiodarone, medication to
> restore heart rhythm, for 3 months. He had no complaints. Claimant reported
> walking 7-8 miles per day. Exam noted good pulses and carotids, regular heart rate
> and rhythm, and very minor pitting edema at ankle. Device showed good heart rate
> trends. In October 2018 claimant was seen in ER for chest pain. Exam noted mild
> tenderness to palpation to right upper chest. EKG showed right axis deviation,
> incomplete right bundle branch block. At a follow up in December 2018 claimant
> reported that he had been more physically active and losing weight. It was noted
> that since 07/22/18, claimant had not had any tachyarrhythmias. It was noted at
> December 2018 visit that claimant is to follow up in one year….
>
> On ADL form, claimant reported that he is independent in his personal care,
> prepares his own foods, does household chores, drives, and grocery shops weekly.
> He reported he can walk for about 30 minutes before needing to rest…
>
> Based on the totality of evidence in file, the above limitations are warranted.

(Tr. 324-325) Dr. Debroy concluded that Plaintiff demonstrated the maximum sustained work

capability for medium exertional work. (Tr. 327-328)

As noted above, in her written decision the ALJ found Dr. Debroy's opinion that Plaintiff

could engage in "medium exertional work with no concentrated exposure to hazards such as

machinery and heights" persuasive, because it was supported by a review of the evidence. (Tr.

22) Specifically, the ALJ noted Dr. Debroy supported her opinion with references to the

echocardiograms, physical examinations, treatment history, and activities of daily living. (Tr. 22)

The ALJ further noted that Dr. Debroy's opinion was consistent with the full hearing-level record

including, among other items, the echocardiogram showing normal LVEF, the pattern of reduced

15

medication and overall conservative treatment, the lack of ICD firing, the plaintiff's rejection of additional treatment and negative or mild symptom complaints, objective findings of normal strength and no edema (or at most, trace edema), and the plaintiff's report of his activities of daily living. (*Id.*) The ALJ went further than Dr. Debroy in one respect, by limiting Plaintiff's exposure to all hazards given his ongoing treatment for congestive heart failure and cardiomyopathy. (Tr. 22)

Plaintiff contends that the ALJ erred in relying on Dr. Debroy's opinion, given that it was rendered almost a year before the administrative hearing (and thus was not based upon the full record), and Dr. Debroy did not personally examine Plaintiff.

"Once the ALJ has decided how much weight to give a medical opinion, the Court's role is limited to reviewing whether substantial evidence supports this determination, not deciding whether the evidence supports the plaintiff's view of the evidence." *Beamer v. Saul*, No. 2:18-CV-00094 JAR, 2020 WL 1511350, at *7 (E.D. Mo. Mar. 30, 2020) (citation omitted). See also *Couch v. Berryhill*, No. 2:18 CV 46 DDN, 2019 WL 1992623, at *6 (E.D. Mo. May 6, 2019) (same). While the Court agrees with Plaintiff that, generally, an ALJ cannot rely on remote evidence to determine a claimant's abilities, see *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995), there is no evidence here that Plaintiff's condition deteriorated after Dr. Debroy rendered her opinion, and indeed, the record shows that Plaintiff's physical impairments remained stable and/or improved. Because there is no evidence that Plaintiff's physical impairment deteriorated from the time Dr. Debroy rendered her opinion to the time of the hearing, the ALJ could properly consider this opinion evidence in determining disability. *Beamer*, 2020 WL 1511350, at *9 (citing *Frankl*, 47 F.3d at 937-39).

16

Furthermore, contrary to Plaintiff's contention, Dr. Debroy's assessment of Plaintiff's limitations is not inconsistent with the record as a whole.  For example, in January of 2020 Dr. Vader noted that Plaintiff reported "no orthopnea, PND[24], palpitations, chest pain, syncope or near syncope."  (Tr. 1301)  He noted that Plaintiff had not felt as though he needed a PRN[25] dose of furosemide for several weeks, and while Plaintiff endorsed mild dyspnea on exertion or fatigue with daily activities, Plaintiff acknowledged the ability to walk about one mile before needing to rest.[26]  (*Id.*)  Dr. Vader stated Plaintiff was endorsing NYHA Class I symptoms, the lowest level of subjective severity.  (Tr. 1303)  He opined that given Plaintiff's "stable mild symptoms today," he likely continued to have normal systolic function.  (*Id.*)  Finally, Dr. Vader requested that Plaintiff follow-up in six months, rather than sooner.  (*Id.*)[27]

Further evidence before the ALJ showed that while Plaintiff endorsed malaise, lethargy, and sluggishness in April 2020, Dr. Brown noted Plaintiff's heart failure was resolving, his LVEF had normalized, and his ICD had not fired recently.  (Tr. 1313-1315)  In May 2020, Plaintiff reported fatigue to Dr. Cheng, but declined a prescription for an alerting agent "because he wants to minimize the number of medications he takes."  (Tr. 886, 891)  Later in May 2020, Plaintiff reported to Dr. Brown that he had fatigue most of the day, every day, but Dr. Brown noted Plaintiff's heart failure was "compensated", and his cardiomyopathy was "probably okay" given

---

[24] "PND" refers to paroxysmal nocturnal dyspnea, a sensation of shortness of breath that awakens the patient.
[25] "PRN" is from the Latin term "Pro Re Nata", which translates to "as needed."
[26] Plaintiff himself attributed many of his symptoms to untreated sleep apnea.  (Tr. 1301) Subsequent to his appointment with Dr. Vader, Plaintiff began seeing Dr. Cathy I. Cheng with the BJC Medical Group Center for Sleep Medicine in January 2020.  After treating Plaintiff for several months, Dr. Cheng noted that Plaintiff reported feeling more energetic with CPAP use.  (Tr. 887)
[27] As noted above, the ALJ provided great detail for her conclusion Dr. Vader's June 2020 medical source statement (and the limitations set forth therein) was not persuasive (Tr. 21), and Plaintiff does not dispute the finding here.

the normal LVEF.  (Tr. 1310, 1312)[28]  Finally, while Plaintiff alleged severe fatigue, evidence in the record shows that his medical providers found him to be alert, awake and oriented both before and after the time frame examined by Dr. Debroy.  (*See, e.g.*, Tr. 1008 (9/16/19), 1295 (1/3/20), 889 (5/8/20))  Accordingly, at the time of the hearing in July 2020, the record as a whole supported the ALJ's consideration of Dr. Debroy's opinion evidence.

It is important to note that the ALJ did not rely on Dr. Debroy's opinion exclusively to support her finding of non-disability.  A review of the ALJ's decision shows that she reached her conclusions after considering and weighing all the relevant evidence of record, as required.  When taken together with the record as a whole, a non-examining consultant's medical opinion may be considered when forming the basis of an ALJ's opinion.  *See Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) ("[T]he ALJ in this case did not rely solely on [the non-examining consultant's] opinion to reach his conclusions.  Rather, the ALJ relied on [the consultant's] opinion as one part of the record, which, as a whole . . . provides substantial support for his findings."); SSR 96-6P, 1996 WL 374180, at *1-3 (Soc. Sec. Admin. July 2, 1996) (an ALJ must treat expert opinion evidence of non-examining providers in conjunction with the other evidence of record).

The ALJ did not err in her consideration of Dr. Debroy's opinion in determining whether Plaintiff was disabled.

2.  Dr. Scher

On September 19, 2019, Stephen S. Scher, PhD, a non-examining psychological consultant, reviewed the evidence of record and completed a Psychiatric Review Technique Form

---

[28] Dr. Brown attributed Plaintiff's fatigue to an "unclear cause," but likely something other than cardiovascular impairments or sleep apnea.  (Tr. 1311-1312)

and Mental RFC Assessment.  (Tr. 317-330)  Based on his review of the record at that time, Dr.

Scher stated that for the period 03/20/2019 to the present, Plaintiff had the MDI of major

depressive disorder.  (Tr. 321)  Dr. Scher provided additional explanation as follows:

> In March 2019 claimant reported feeling sad, hopeless, worthless, and
> overwhelmed.  He reported suicidal thoughts but not having any currently.  He
> refused medications at this exam.  MSE noted claimant had fair eye contact, good
> hygiene, no psychomotor abnormalities, no hallucinations or delusions, depressed
> mood, goal oriented thought flow, flat affect, fair insight and judgment, adequate
> fund of knowledge, and intact memory.  Later in March 2019, claimant reported his
> sleep, feelings of helplessness and worthlessness, and depression improving.  At
> Voc Rehab meeting in April 2019 claimant reported having anxiety.  Claimant
> reported crying spells, poor self direction, stress, anxiety, and difficulty paying
> attention.  In June 2019, claimant reported being depressed due to health, housing,
> and employment issues.
>
> On ADL form, claimant reported that his anxiety makes it difficult for him to
> interact and that he has issues focusing and concentrating.  He reported he does not
> need reminders to take care of personal needs or medications.  He prepares his own
> foods and does household chores.  He drives and grocery shops weekly.  He
> reported he is able to manage funds.  He denied problems getting along with others.
> He reported being able to follow instructions but may need to write them down.  He
> reported being able to play on the computer, video games, or do puzzles for one
> hour per sitting.  He completed forms on his own.
>
> Claimant's reported limitations are more limiting than the objective evidence
> supports.  His statements are considered partially consistent.
>
> Based on the totality of evidence in file, it is reasonable that claimant retains the
> capacity to perform simple repetitive tasks.

(Tr. 321-322)  Dr. Scher summarized the presence and degree of Plaintiff's specific understanding

and memory capacities and/or limitations as follows:  "The claimant can understand, remember,

and carry out a two-step command involving simple instructions."  (Tr. 326)[29]  He summarized

Plaintiff's sustained concentration and persistence capacities and/or limitations as follows:  "The

---

[29] Dr. Scher found Plaintiff was not significantly limited in his ability to remember locations and
work-like procedures or understand and remember very short and simple instructions, but was
moderately limited in his ability to understand and remember detailed instructions.  (Tr. 325-326)

claimant retains sufficient mental capacity to carry out two-step commands with adequate persistence and pace but he would struggle with detailed or complex instructions."[30]  (*Id.*)

In her written decision, the ALJ found Dr. Scher's opinion somewhat persuasive.  (Tr. 23)  Specifically, she stated it was "supported by a review of the evidence, including the treatment history and mental status evaluations", and "[i]nsofar as Dr. Scher did not find more restrictive limitations, his opinion is consistent with the conservative treatment history (including no medications) and findings of sustained concentration and normal mood[.]" (*Id.*)  The ALJ agreed with Dr. Scher's suggestion that Plaintiff could understand, remember and carry out a two-step command involving simple instructions with adequate persistence and pace, but would struggle with detailed or complex instructions, and could perform simple repetitive tasks.  (*Id.*)  The ALJ further specified that Plaintiff would need a low stress environment, however, given his ongoing treatment for depression.  (*Id.*)

Plaintiff contends that the ALJ erred in relying on Dr. Scher's opinion, even in part, given that it was rendered almost a year before the administrative hearing, and is not consistent with the evidence he reviewed or with the evidence of record as a whole.

Upon consideration, the Court finds no evidence that Plaintiff's condition deteriorated after Dr. Scher rendered his opinion.  Instead, the record shows that Plaintiff's mental impairment

---

[30] Dr. Scher found Plaintiff was not significantly limited in his abilities to carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 326)  He found Plaintiff was moderately limited in his ability to carry out detailed instructions, but had neither social interaction nor adaptation limitations.  (*Id.*)

remained stable and possibly improved during the time period between Dr. Scher's assessment and the hearing. Because there is no evidence that Plaintiff's mental impairment deteriorated from the time Dr. Scher rendered his opinion to the time of the hearing, the ALJ properly considered this opinion evidence in determining disability. *Beamer*, 2020 WL 1511350, at \*9.

Furthermore, contrary to Plaintiff's contention, Dr. Scher's opinion of Plaintiff's limitations is not inconsistent with the record. At the time he rendered his opinion in September 2019, the evidence showed that when Plaintiff sought treatment for depression on March 7, 2019[31], he was working as a security guard. (Tr. 776-777) The Community Support Specialist who examined Plaintiff found no evidence of delusions or auditory or visual hallucinations, and found Plaintiff's "flow of thought" to be goal oriented and organized. (Tr. 777) Plaintiff refused an offer of a prescription for Lexapro at that time, stating he preferred to research the drug before taking it. (Tr. 778) When he returned on March 21, 2019, Plaintiff reported that he was "doing better," and was experiencing good appetite, improving sleep and a lessening of feelings of worthlessness and helplessness. (Tr. 781) At that time, Plaintiff reported having a new job helping the elderly with daily tasks. (*Id.*) He again refused medication in favor of therapy only. (*Id.*)

Plaintiff did eventually agree to a trial of Lexapro in October of 2019, after Dr. Scher prepared his report. (Tr. 1252) He voluntarily discontinued the drug less than three months later, however, because he felt tired and experienced dry mouth. (Tr. 1395) On March 5, 2020 Plaintiff again declined medication, and the service provider noted Plaintiff was "positive in the direction everything is going," and wanted to try and work "now that he is feeling better." (Tr. 1414)

---

[31] The only time that Plaintiff sought psychiatric help prior to March of 2019 was after his mother passed away in 1996. (Tr. 776)

Furthermore, Plaintiff's therapy records from both before and after Dr. Scher's report reflect that Plaintiff's mental symptoms were not as limiting as he claims. For example, providers repeatedly concluded that Plaintiff was cooperative, organized and goal oriented. (Tr. 777 (3/7/19), 1368 (10/29/19), 1379 (11/26/19), 1393 (1/9/20), 1416 (3/5/20)) They further reported that Plaintiff's memory was normal, and his judgment and insight were fair to good and improving. (Tr. 785 (3/21/19), 1370 (10/29/19), 1381 (11/26/19), 1395 (1/9/20), 1418 (3/5/20)) Records show that Plaintiff continued to look for work while applying for disability. (Tr. 793 (4/30/19), 796 (5/22/19), 808 (7/25/19), 1347 (9/5/19), 1364 (10/24/19), 1365 (10/28/19), 1399 (1/15/20), 1411 (3/2/20), 1414-1415 (3/5/20), 1420 (3/9/20)[32]) *See Whitman v. Colvin*, 762 F.3d 701, 708 (8th Cir. 2014) (representing oneself as willing and available for work (in the context of unemployment insurance) is inconsistent with claims of disabling symptoms). Finally, on April 20, 2020, Plaintiff reported that he was learning a new language, going outside, watching television, joining board games and reading. (Tr. 1432) Under these circumstances, the Court finds that at the time of the hearing in July 2020, the record as a whole supported the ALJ's consideration of Dr. Scher's opinion evidence in determining whether Plaintiff was disabled.

**VI.   Conclusion**

Upon consideration of the foregoing, the Court holds that substantial evidence supports the ALJ's decision. Although Plaintiff is correct that there are medical records showing, among other things, ongoing fatigue and intermittent depression (ECF No. 26, P. 8), this Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence on the record as a whole. *See* 42 U.S.C. §§ 405(g);

---

[32] In the March 9, 2020 report, Plaintiff's case manager noted that Plaintiff reported that he felt more energetic, and had an interview scheduled for March 11. (Tr. 1420)

1383(c)(3); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  As long as there is substantial evidence in the record that supports the decision, this Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). *See also Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (internal quotation marks and citation omitted) (An ALJ's decision is not to be disturbed "so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.").  Here the ALJ's decision, and, therefore, the Commissioner's, was within the "zone of choice". *See Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017).  The Court therefore finds that substantial evidence supported the ALJ's RFC determination.

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff "has not been under a disability, as defined in the Social Security Act, since July 16, 2019, the date the application was filed[.]"  (Tr. 25)

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of February, 2023.